**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*


BERNADETTE NELSON-ROGERS,[1]          *

    **Plaintiff,**          *

**v.**          Case No.: GJH-17-3326

              *

KAISER PERMANENTE,          *

    **Defendant.**          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff Bernadette Nelson-Rogers brought this civil action against her former employer, Defendant Kaiser Permanente, alleging claims of retaliation, failure to accommodate, hostile work environment, and disability discrimination under the Americans with Disabilities Act of 1991 ("ADA"), 42 U.S.C. § 12201 *et seq.*, and the Maryland Fair Employment Practices Act ("FEPA"), MD. CODE ANN., STATE GOV'T § 20-601 *et seq.*, based on Defendant's response to Plaintiff's asthma, coughing, and contact dermatitis. ECF No. 1. Pending before the Court is Defendant's Motion for Summary Judgment. ECF No. 14. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendant's Motion for Summary Judgment is granted.

## I.     BACKGROUND[2]

Plaintiff worked as a Medical Transcriptionist for Defendant from 1998 to 2016. ECF No. 14-3 at 7.[3] The primary role of Medical Transcriptionists is to transcribe diagnostic imaging

---

[1] The Clerk shall amend the docket to reflect that Plaintiff's correct name is Bernadette Nelson-Rogers.
[2] These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.
[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

dictation to provide a permanent record of patient care. *Id.* at 79. Defendant's Medical

Transcriptionists were represented by the Office and Professional Employees International Union

("OPEIU") Local 2. *Id.* at 11–12, 79.

Plaintiff has a disability of asthma, coughing, and contact dermatitis. ECF No. 14-3 at

128; ECF No. 14-4 at 19. As of 2012, she was stationed with all Medical Transcriptionists at

Defendant's Prince George's County Medical Center ("PG County Medical Center"). ECF No.

14-6 ¶ 1. The PG County Medical Center, like all of Defendant's facilities, was subject to a

Smoke and Tobacco Free Policy. ECF No. 15-1.[4]

### A. Initial Requests for Accommodation

In August 2012, Deirdre Safikhani became Plaintiff's supervisor. ECF No. 14-3 at 12, 13.

At some point later, Plaintiff informed Ms. Safikhani that the location of her work desk caused

her to cough and asked to be moved. *Id.* at 13. Ms. Safikhani moved Plaintiff to the Health

Information Management Services ("HIMS") Department at the PG County Medical Center. *Id.*

at 14; ECF No. 14-6 ¶ 2. The move alleviated Plaintiff's cough for a few months, but it

eventually returned. ECF No. 14-3 at 14–15.

In February 2014, Ms. Safikhani moved Plaintiff back to the Transcription Department

because the HIMS Department needed Plaintiff's workstation for a new employee. ECF No. 14-6

¶ 4. After Plaintiff returned to the Transcription Department, she told Ms. Safikhani that the air

quality worsened her cough. *Id.* ¶ 5. Ms. Safikhani requested that the Facility Engineering

---

[4] Plaintiff asserts in her Statement of Facts that Defendant also had a fragrance-free policy that applied to all facilities. ECF No. 15 at 9. In support of this assertion, she cites to an exhibit that contains only Defendant's Smoke and Tobacco Free Policy, which does not include such a policy. *See* ECF No. 15-1. This is not the only instance of Plaintiff citing to portions of the record that do not support her assertions or citing to evidence that is not in the record, *see, e.g.*, ECF No. 15 at 5–6 (citing deposition testimony that is not in the record); *id.* at 10 (citing a September 23, 2015 email that is not in the record). Plaintiff had the opportunity to supplement the evidence provided by Defendant when she submitted her response, but for the most part, she did not. Thus, the Court will note that it will only accept factual assertions by Plaintiff that are supported by the evidence and it will only consider evidence that is actually in the record.

Department perform an air quality test, and she contacted Venecia Calloway, an Integrated Disability Management ("IDM") Case Manager, for assistance.[5] The air quality test revealed higher than recommended carbon dioxide levels, so the Facility Engineering Department worked with the building's landlord to address the issue, which included cleaning the evaporators and adding outside air intakes into the air handling system. *Id.* ¶ 6; ECF No. 14-6 at 10–14. Air quality testing from June 16–19, 2014 showed the air quality to be within recommended guidelines and OSHA permissible exposure limits. ECF No. 14-6 ¶ 7; ECF No. 14-6 at 22.

In October 2014, Plaintiff informed Ms. Safikhani that the blowing of the HVAC worsened her cough and asthma. ECF No. 14-6 ¶ 8. Ms. Safikhani relocated her to three different locations within the Transcription Department to try to avoid vents blowing down on her. *Id.* When Plaintiff's cough did not completely abate, Ms. Safikhani asked her to provide documentation from her physician regarding other steps that could mitigate her cough. *Id.* On October 29, 2014, Ms. Safikhani reached out to IDM for guidance on how to proceed. *Id.* On October 30, 2014, Tyrone Simpson, an IDM Case Manager, informed Ms. Safikhani that IDM would facilitate the ADA accommodations process and would obtain medical information for review. *Id.* ¶ 9.

On November 11, 2014, Plaintiff presented Ms. Safikhani with a Verification of Treatment ("VOT") Form from a doctor indicating that she had recently undergone surgery and, due to an environmental allergy, seemed to be suffering from a chronic cough, and instructing Defendant to "make every effort to adjust her workplace to accommodate her condition." ECF No. 14-6 ¶ 10; ECF No. 14-6 at 28. That same day, Ms. Safikhani informed Mr. Simpson that she had received the VOT Form. ECF No. 14-6 ¶ 10; ECF No. 14-6 at 30. On November 12,

---

[5] IDM is part of Defendant's Human Resources Department. ECF No. 14-5 ¶ 1. An IDM Case Manager's duties include managing ADA job accommodation requests. *Id.*

2014, Mr. Simpson emailed Plaintiff to tell her that Defendant interpreted the VOT Form as a formal request for an accommodation and, as such, asked her to have her doctor complete a Health Care Provider Assessment Form. ECF No. 14-3 at 82–83. Plaintiff's job description, a Memo to Health Care Provider, and the Health Care Provider Assessment Form were attached to the email. ECF No. 14-3 at 19–20.

Plaintiff provided the completed Health Care Provider Assessment to Defendant on December 12, 2014, *id.* at 21–22, but it is unclear what occurred with respect to an accommodation until March 2015, when Mr. Simpson approached Plaintiff about the possibility of working at the Customer Service Center ("CSC") in Silver Spring, Maryland and she agreed. *Id.* at 24–27.

**B.  First Assignment to the CSC**

The CSC had been smoke- and fragrance-free since at least 2013. ECF No. 14-8 ¶ 2. Defendant placed posters inside the building that stated it was a fragrance-free environment and there was a "Breathe Easier" sign indicating that the CSC was a fragrance-free environment placed near the building's front door. *Id.* ¶ 3. At the back of the building, there was a sign indicating that it was a smoke-free environment, as well as posters with frequently asked questions regarding the smoke-free policy. *Id.* ¶¶ 4, 5. On April 6, 2015, Plaintiff began working at the CSC in a large room with twenty-five to thirty-five low-walled cubicles. ECF No. 14-3 at 28–29. The move initially helped Plaintiff's cough, but it returned after a few months. *Id.* at 29, 30.

On August 6, 2015, Plaintiff complained to Ms. Safikhani that there were two women who occasionally visited staff at the CSC and one of them wore perfume with a very strong smell that caused Plaintiff to choke. ECF No. 14-6 ¶ 12; ECF No. 14-6 at 34–35. She also mentioned

that there were smokers who smoked outside the back door to the CSC and right under the "no smoking" sign. ECF No. 14-6 ¶ 12; ECF No. 14-6 at 34–35. On August 10, 2015, Ms. Safikhani emailed CSC supervisors Peggy Shiblie, a HIMS Quality Assurance Supervisor, and Guyane Massiah, the Coding Supervisor, about these issues. *Id.* Ms. Shiblie then spoke to staff members who sat close to Plaintiff, but they did not recall any visitors wearing a strong perfume. ECF No. 14-8 ¶ 7. She reported this to Ms. Safikhani and stated that she would keep an eye out for the issue. ECF No. 14-6 ¶ 12; ECF No. 14-6 at 38. Regarding any smokers outside the building, Ms. Shiblie stated that she "believe[d] the smoking issue ha[d] already been addressed with the building on more than one occasion" and that she would "keep an eye out" for any smokers. ECF No. 14-6 ¶ 12; ECF No. 14-6 at 38. Both Ms. Shiblie and Ms. Massiah noted that their staff had complained to them about Plaintiff's cough and that she did not cover her mouth. ECF No. 14-8 at 16.

On August 11, 2015, Ms. Safikhani forwarded Ms. Shiblie's and Ms. Massiah's emails to Mr. Simpson and Ms. Calloway in IDM "as a means to ask if [Plaintiff] c[ould] be moved anywhere else, *preferably* with no one else around her." ECF No. 14-8 at 15. She stated that Plaintiff's cough was "the main reason" that she was moved from the Transcriptionist Department to the HIMS Department at the PG County Medical Center and then from the PG County Medical Center to the CSC. *Id.* She stated further:

> It is not a cough she can control, and it certainly isn't something due to the environment. Still, it's not a choice on her part, it's a condition she has, and she functions well otherwise. I just hate that workers around her have to suffer, too, as I know firsthand how disruptive her coughing fits can be. I also hate that others are concerned she has something contagious.

*Id.*

Plaintiff herself did not complain to anyone about her cough's return until September 2015 when she informed Ms. Calloway. ECF No. 14-3 at 29–31, 99. She also complained that a cigarette smell would linger in her work area after coming in through the back door and the vent and that some of Defendant's employees would use heavy cologne, perfume, and other fragrances in violation of the CSC's policies. *Id.* at 99. She asked about alternative work locations other than the PG County Medical Center. *Id.* at 30–31, 99.

Ms. Calloway offered Plaintiff two options: returning to the PG County Medical Center or relocating to Defendant's Northwest Medical Center in the District of Columbia (the "Northwest Medical Center"), which had an area where she could largely be by herself and thus not be exposed to smoke, loud perfumes, or other irritating fragrances. ECF No. 14-3 at 31–35; ECF No. 14-5 ¶ 6. On September 22, 2015, Plaintiff emailed Ms. Calloway, stating "I do not wish to return to the PG Center" and "I cannot go to the Northwest Center." ECF No. 14-3 at 100. She did not want to return to the PG County Medical Center because the building "caused [her] to have asthma and respiratory systems," *id.*, and she did not want to relocate to the Northwest Medical Center because it would be "inconvenient" and a "hassle" for her to commute to Washington, D.C. from where she lived in Maryland, *id.* at 36, 37, 41. She stated further that the problem at the CSC was that it was supposed to be a smoke- and fragrance-free environment, but the supervisory staff at the CSC did not enforce those rules, and that she "would recommend that the rules be enforced at CSC." *Id.* at 100.

### C. Reassignment to the PG County Medical Center

Having determined that the CSC was an ineffective accommodation, Ms. Safikhani sent a memo to Plaintiff on September 28, 2015 informing her that the letter served as her thirty days' notice of being relocated to the PG County Medical Center. ECF No. 14-3 at 101. The memo

stated that Plaintiff's initial relocation to the CSC "was the result of an informal accommodation on my part as your supervisor," and that if she was opposed to the relocation, she would need to submit paperwork for a formal accommodation via IDM. *Id.*

Ms. Safikhani's description of the accommodation as "informal" caused confusion. *Id.* at 53–54. During a meeting on September 28, 2015, Plaintiff asked Ms. Safikhani what the term meant three separate times; Ms. Safikhani told her that she did not know. *Id.* at 105. Plaintiff also emailed Ms. Calloway to ask about the term, who responded that she would research the question and get back to her. *Id.* On September 30, 2015, Plaintiff emailed Mr. Simpson to ask what made the accommodations informal, reminding him that she had "filled out a form and also had two physicians fill out forms." *Id.* at 105. On October 6, 2015, she also emailed Juanita Bowman-Rose, the head shop steward for the Medical Transcriptionists, asking similar questions about the meaning of "informal accommodation" and inquiring about union representation. *Id.* at 50–51, 105. Ms. Bowman-Rose explained that paperwork was required to receive an accommodation. *Id.* at 51. She said, "If you do not do that and they move you, it's informal. If you do that, your move is formal." *Id.* Plaintiff had already submitted paperwork to IDM from her doctor and therefore believed it was a mistake for Ms. Safikhani to refer to the accommodation as "informal." *Id.* at 52. On October 9, 2015, Plaintiff emailed Ms. Calloway again inquiring about the meaning of an "informal accommodation." *Id.* at 5, 53.

At the same time that Plaintiff was trying to handle her accommodations during the Fall of 2015, the Transcription Department implemented increased production standards as part of an ongoing effort that had begun when Ms. Safikhani became supervisor in 2012. *Id.* at 54. As part of this process, there was a meeting on October 19, 2015 for bargaining unit Medical Transcriptionists, including Plaintiff, during which management explained why it was increasing

productivity standards. *Id.* at 55–56, 58. During that meeting, management explained that contractors doing the same type of work as the Medical Transcriptionists charged, on average, $2.87 per transcription job, whereas it cost $7.94 per job for bargaining unit Medical Transcriptionists. *Id.* at 56. The union filed a grievance challenging the implementation of the standard, but later withdrew it. ECF No. 14-7 ¶ 8.

On November 9, 2015, Plaintiff returned to the PG County Medical Center. ECF No. 14-3 at 59. She was assigned to a seat within the Transcription Department. *Id.* at 60. She was not given a choice as to where to be assigned, but she also did not request to sit outside of the Transcription Department. *Id.* On November 20, 2015, Plaintiff once again emailed Ms. Safikhani, Ms. Bowman-Rose, and an individual named Vivene Williams asking "what made [her] paper work/accommodations informal." *Id.* at 109. On November 23, 2015, Ms. Safikhani met with Plaintiff to discuss her accommodations. *Id.* at 108. In an email later that day, she acknowledged that she was mistaken when she referred to Plaintiff's accommodations as "informal." *Id.* She had misunderstood IDM's use of the word "informal" when referring to accommodations made for a different employee who had not submitted paperwork to IDM, and she affirmed that Plaintiff's accommodation was formal because she had already submitted the necessary paperwork. *Id.* She stated further that the move to CSC had "turned out to be an ineffective accommodation based on the complaints [Plaintiff] shared with [Ms. Safikhani] over the months while at the CSC whenever [Ms. Safikhani] checked in with [her]" and that, based on emails Plaintiff had exchanged with Ms. Calloway, Plaintiff's condition had not improved while at the CSC. *Id.* Ms. Safikhani explained that she "would like to see a permanent accommodation made available by [Defendant] for [Plaintiff's] condition. Thus, far, [Plaintiff's] coughing has

not improved when located in [the Transcription or HIMS Departments at the PG County Medical Center or at the CSC]." *Id.*

Plaintiff responded that she had never complained to Ms. Safikhani but had only referred to smoke- and fragrance-free policies that were supposedly in place at the CSC and that she wanted to be enforced. *Id.* at 107. She also complained about how long it took for Ms. Safikhani and others to answer her questions about the "informal accommodations." *Id.* Ms. Safikhani responded that she agreed that Defendant "did not enforce its own rules as far as enforcing a smoke-free campus and a fragrance-free facility," but the relocation to CSC was deemed an ineffective accommodation because Plaintiff's cough did not abate during the six months she worked at the CSC, it was too difficult for Ms. Safikhani to manage Plaintiff's information technology ("IT") issues from her station at the PG County Medical Center, Plaintiff's resulting downtime was inefficient, and Plaintiff's cough was disruptive to those sitting around her at the CSC and some had expressed concerns about Plaintiff having something contagious. *Id.* at 106.

Between November 25 and December 20, 2015, Plaintiff had three asthma attacks while stationed at the PG County Medical Center. *Id.* at 62. During that time, she also asked Ms. Safikhani at least twice to move her to another work area within the building. *Id.* Given Plaintiff's apparent inability to work at the PG County Medical Center, Defendant decided to relocate her again. ECF No. 14-7 ¶ 9. Donna Harris, the Senior Regional Operations Manager of HIMS and Ms. Safikhani's supervisor, emailed Plaintiff to again suggest that she accept a relocation to the Northwest Medical Center. *Id.* ¶¶ 1, 9; ECF No. 14-7 at 8.

Ms. Harris explained the advantages of the Northwest Medical Center to Plaintiff. ECF No. 14-7 ¶ 6; ECF No. 14-7 at 8. First, Plaintiff would work in a two-office section of a suite that was separated from the rest of the suite by doors. ECF No. 14-7 at 8. Her office would be away

from the suite entrance and there was one other employee in the suite who only worked three days per week. *Id.* There was also no lunchroom and little likelihood that perfume or secondhand smoke from individuals coming into or out of the building would enter Plaintiff's interior suite. *Id.* Second, Plaintiff would have access to an IT person assigned to her specific location. *Id.* Third, the Northwest Medical Center, unlike the CSC, had a dedicated facilities staff member on site who could address a variety of environmental issues should the need arise. *Id.* Fourth, it was not far from the PG County Medical Center and was serviced by a free shuttle from Defendant's Metro-accessible Capitol Hill location if Plaintiff chose not to drive. *Id.* Fifth, if Ms. Safikhani needed to provide any training or mentoring to Plaintiff, she could do it in the privacy of the office space. *Id.* Finally, it was immediately available, while other spaces would require approval from teams outside HIMS. *Id.*

Plaintiff again declined to be reassigned to the Northwest Medical Center. ECF No. 14-7 ¶ 9. Instead, she wanted to be reassigned to the CSC, so Defendant ultimately reassigned her to that location on December 30, 2015. *Id.* At some point in December, Plaintiff also filed a complaint against Defendant with the Maryland Department of Labor, Licensing and Regulation ("DLLR") alleging that "poor indoor air quality may be causing ill health effects in employees." ECF No. 14-3 at 130; ECF No. 14-4 at 7.

### D. Return to the CSC

Plaintiff began working at the CSC by January 2016. ECF No. 14-3 at 66–67. After a few weeks, she confirmed to IDM that her working environment at the CSC was fine for her condition, as memorialized in an email from Ms. Calloway on January 28, 2016. *Id.* at 68, 111. Specifically, Ms. Calloway confirmed that Plaintiff was not experiencing any difficulty with the environment at the CSC, Plaintiff had elected to remain at the CSC even though she had been

offered four additional options at the Northwest Medical Center, PG County Medical Center, Camp Springs Medical Center, and Marlow Heights Medical Center, and that IDM viewed the CSC as an effective accommodation. *Id.* at 111.

At some point after returning to the CSC, Plaintiff received a Level 3 corrective action. ECF No. 14-4 at 8, 27; ECF No. 14-6 ¶ 17. Ms. Safikhani stated that it was for mismatching the transcription for patients on multiple occasions. ECF No. 14-6 ¶ 7. At some point, but in January of 2016 at the earliest, Plaintiff also filed a Charge of Discrimination ("Charge") against Defendant with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 14-3 at 121. The Charge alleged that she had been transferred back and forth between the PG County Medical Center and the CSC after requesting a reasonable accommodation, and that she suffered three asthma attacks after returning to the PG County Medical Center. *Id.* A typed paragraph describing the reasons Plaintiff was given for her relocations was crossed off with a handwritten mark and there was a handwritten statement that "[n]o reasonable explanation has been provided for denying my request." *Id.* Plaintiff did not sign or date the Charge, type it, or make the handwritten edits to it. *Id.* 72–75.

In February 2016, after filing the EEOC Charge, Plaintiff filed an internal Equal Employment Opportunity ("EEO") complaint with Defendant, listing several individuals, including Ms. Harris. *Id.* at 129; ECF No. 14-4 at 8. The internal EEO complaint protested Plaintiff's reassignment back to the PG County Medical Center from the CSC without any explanation of the meaning of "informal accommodation." ECF No. 14-4 at 10.

On May 11, 2016, Plaintiff complained to Ms. Calloway that someone was smoking outside the backdoor of the CSC. ECF No. 14-3 at 119. Ms. Calloway responded that she would check into the issue and determine steps to have it rectified. *Id.* On May 12, 2016, Ms. Calloway

emailed a number of Defendant's employees to inquire about the best contact person to ensure enforcement of the smoke-free policy. ECF No. 14-5 at 253–54. On May 13, 2016, she received confirmation from Matthew Douglas, a Facilities Services/Project Coordinator, that he had sent out a general email to the managers at the CSC regarding the smoking incident. ECF No. 14-5 ¶ 10; ECF No. 14-5 at 253. He also stated that Defendant's options were limited as to the entire building because it was a leased facility, so it could only try to enforce its policy. ECF No. 14-5 at 253.

On November 10, 2016, Plaintiff filed a signed Amended Charge of Discrimination alleging retaliation and disability discrimination. ECF No. 14-3 at 128–29. In the first count, she alleged that the PG County Medical Center caused her disability and that her symptoms improved after she moved to the CSC. She alleged further that Defendant retaliated against her and failed to accommodate her when she was moved back to the PG County Medical Center without request or explanation after she complained about Defendants' nonenforcement of its smoke- and fragrance-free policies. *Id.* at 128. In the second count, she alleged that Plaintiff subjected her to retaliatory disciplinary actions after she filed the DLLR Complaint. *Id.* at 129. In the third count, she alleged that Plaintiff unilaterally implemented the increased productivity standards and enforced them discriminatorily in retaliation against Plaintiff for filing her internal EEO Complaint and the original EEOC Charge. *Id.*

### E.  Present Action

On November 9, 2017, Plaintiff filed a Complaint against Defendant in this Court alleging fourteen separate violations of the ADA and FEPA. ECF No. 1. Counts I through III allege retaliation under the ADA, Count IV alleges failure to accommodate under the ADA, Count V and VI allege hostile work environment under the ADA, Count VII alleges disability

discrimination under the ADA, Counts VIII through X allege retaliation under FEPA, Count XI alleges failure to accommodate under FEPA, Counts XII and XIII allege hostile work environment under FEPA, and Count XIV alleges disability discrimination under FEPA. *Id.* On May 10, 2019, Defendant filed a Motion for Summary Judgment on all claims alleged in the Complaint. ECF No. 14. Plaintiff filed a response on May 24, 2019, ECF No. 15, and Defendant filed a reply on June 6, 2019, ECF No. 16.

## II.    STANDARD OF REVIEW

"Under [Federal Rule of Civil Procedure] 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. Importantly, at the summary judgment stage, it is not the Court's function to weigh the evidence but simply to decide if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute of material fact is genuine if the conflicting evidence creates "fair doubt," *Cox v. Cty. Of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001), such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Nevertheless, a

"mere scintilla of proof" is not enough to defeat a motion for summary judgment. *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 252). To defeat the motion, the party opposing summary judgment must submit evidentiary materials showing facts on the basis of which the finder of fact could reasonably decide the case in its favor. *Anderson*, 477 U.S. at 252. If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Id.*

## III.     DISCUSSION

### A.  Failure to Accommodate Claims (Counts IV and XI)

Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability…." 42 U.S.C. § 12112(a). Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Id.* § 12112(b)(5)(A). FEPA similarly prohibits employers from "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee." MD. CODE ANN., STATE GOV'T § 20-606(a)(4). To establish a prima facie case for failure-to-accommodate, a plaintiff must show that (1) she was an individual with a disability within the meaning of the statute, (2) the employer had notice of this disability, (3) with reasonable accommodations she could perform the essential functions of the position, and (4) the employer refused to make such accommodations. *Brady v. Bd. of Educ. of Prince George's Cty.*, 222 F. Supp. 3d 459, 468 (D. Md. 2016).[6] For an

---

[6] FEPA, as the Maryland state analogue to federal anti-discrimination statues, prohibits substantially the same conduct as the ADA. Thus, courts generally treat the analysis of claims under the ADA and FEPA as coterminous.

accommodation to be reasonable, it need only be "sufficient to meet the job-related needs of the individual being accommodated." *See Corrigan v. Perry*, 139 F.3d 888 (Table), 1998 WL 129929, at *9 (4th Cir. 1998) (quoting 29 C.F.R. § 1630 app.) (internal quotation marks omitted). Plaintiff claims that Defendant violated the ADA and FEPA in September 2015 by withdrawing the CSC accommodation and reassigning her back to the PG County Medical Center where the symptoms of her disability had initially manifested.

There is no dispute that Plaintiff was an individual with a disability and Defendant had notice of the disability; rather, the parties disagree as to whether Defendant refused to provide Plaintiff with a reasonable accommodation. The undisputed evidence in the record shows that it did not. Prior to moving Plaintiff back to the PG County Medical Center, Defendant offered to relocate Plaintiff to the Northwest Medical Center, but she declined. ECF No. 14-3 at 33–39; 14-5 at 242. The evidence shows that the Northwest Medical Center would have been "reasonable and effective to address [Plaintiff's] disability." *See Coghill v. Bd. of Educ. of Prince George's Cty.*, Case No. GJH–14–2767, 2017 WL 1049470, at *7 (D. Md. Mar. 17, 2017). At that location, Plaintiff would have worked in a separate office essentially by herself and away from other people and entrances and with minimal exposure to the smoke and fragrance irritants about which she complained, and it had on-site IT and facilities personnel and was accessible by free and public transportation. ECF No. 14-3 at 34; ECF No. 14-5 ¶ 6; ECF No. 14-7 ¶ 6. Thus, it would have allowed Plaintiff to perform the essential functions of her job without undue hardship for Defendant. Because Plaintiff rejected a reasonable accommodation, she "cannot prove that [s]he was a qualified individual under the ADA, such that had [s]he been given a

*See, e.g., Brady*, 222 F. Supp. 3d at 474; *Wimbush v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, Case No. TDC–14–525, 2016 WL 775410, at *19 (D. Md. Feb. 29, 2016); *Davidson v. Sarnova, Inc.*, Case No. JKB–17–1067, 2017 WL 5564654, at *4 n.3 (D. Md. Nov. 20, 2017). Here, Plaintiff alleges that the same conduct violated both the ADA and FEPA. Accordingly, the Court will analyze these claims together.

reasonable accommodation, [s]he could have 'perform[ed] the essential functions of the job.'"
*Elledge v. Lowe's Home Ctrs., LLC*, Case No. 5:16–cv–227–RJC–DCK, 2018 WL 6705537, at
*12 (E.D.N.C. Dec. 20, 2018) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir.
2013)); *see also Andrews v. Commonwealth of Virginia*, 232 F.3d 886 (Table), 2000 WL
1532333, at *1 (4th Cir. 2000). She therefore cannot prove her failure-to-accommodate claim.
*See Elledge*, 2018 WL 6705537, at *12; *Andrews*, 232 F.3d 886 (Table), 2000 WL 1532333, at
*1.

It is Plaintiff's burden to demonstrate that Defendant's offered accommodation was
unreasonable, *see Wehner v. Best Buy Stores, L.P.*, Case No. MJG–15–2163, 2017 WL 952685,
at *5 (D. Md. Mar. 10, 2017), but Plaintiff does not argue that the Northwest Medical Center
would not have allowed her to perform the essential functions of her job. Rather, she contends
that the accommodation would have required a long commute, she was concerned that Defendant
would continue its nonenforcement of the smoke- and fragrance-free policies at that location, and
the most reasonable action would have been for Defendant to enforce its policies at the CSC.
ECF No. 15 at 17. She contends further that Defendant's decision, "under the guise of an
'informal' policy," to place her back at the PG County Medical Center where she had previously
suffered harm was unlawful. ECF No. 15 at 24–26. These arguments are unavailing.

First, Plaintiff's rejection of the Northwest Medical Center accommodation due to the
longer commute does not render Defendant's conduct violative of the ADA or the
accommodation unreasonable because the longer commute does not implicate Plaintiff's job-
related needs. *See Corrigan v. Perry*, 139 F.3d 888 (Table), 1998 WL 129929, at *9 (stating that
a reasonable accommodation need only "meet the job-related needs of the individual being
accommodated"); *Corder v. Lucent Techs. Inc.*, 162 F.3d 924, 928 (7th Cir. 1998) (granting

summary judgment on failure-to-accommodate claim where plaintiff was offered a relocation accommodation but turned it down due to the "significantly lengthier commute she would have to endure"); *Pinto v. New York City Admin. for Children's Servs.*, Case No. 18–cv–1852 (KBF), 2018 WL 4333990, at *10 (S.D.N.Y. Sept. 11, 2018) (granting summary judgment on plaintiff's failure-to-accommodate claim where she rejected a relocation accommodation due to "the cost and time associated with commuting to the proposed sites, but ha[d] failed to cite any case suggesting that an employer must accommodate an employee's commuting preferences—likely because the case law cuts the other way" (citing cases)).

Next, even assuming that Plaintiff's concern that Defendant would continue its nonenforcement of the smoke- and fragrance-free policies at the Northwest Medical Center was relevant, there is no evidence in the record that Plaintiff communicated this specific concern to Defendant until after she was relocated back to the CSC for the second time.[7] Given that the ADA requires an employer and employee to engage in an "interactive process" to determine the appropriate reasonable accommodation, and that process "requires bilateral cooperation, open communication, and good faith," it follows that Defendant cannot be held liable for failing to provide a reasonable accommodation based on a concern that Plaintiff did not communicate about the proposed accommodation. *See Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 483 (E.D.N.C. 2015) ("If an employer engages in the interactive process with the employee in good

---

[7] In her opposition, Plaintiff states that she informed Defendant that "she feared the same issues with non-enforcement of a smoking policy" and "she could not change her schedule to arrive at 5:30am to the Northwest facility as would have been required." ECF No. 15 at 17. She then cites to a portion of Ms. Harris's deposition. *Id.* The cited deposition testimony indicates that at some point prior to 2016, Defendant offered to place Plaintiff in a hotel space within the PG County Medical Center. ECF No. 16-1 at 5–6; ECF No. 14-3 at 110. The hotel space was not available until 7:30 a.m., but Plaintiff wanted to arrive to work at 5:30 a.m. ECF No. 16-1 at 5. This testimony provides no evidence with respect to the Northwest Medical Center. Moreover, it directly contradicts Plaintiff's assertion in her brief that she would have been required to arrive at work at 5:30 a.m. and did not want to; rather, it appears that she *did* want to arrive at work at 5:30 a.m., but the hotel space at the PG County Medical Center was not available at that time.

faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations." (quoting *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132–33 (1st Cir. 2014) (internal quotation marks omitted))). Moreover, although there is evidence in the record that Defendant was not enforcing its policies at the CSC, *see* ECF No. 14-3 at 106, there is no evidence that the same nonenforcement occurred at the Northwest Medical Center. This sort of speculative concern about the nature of the proposed accommodation that was otherwise reasonable does not seem to rise to the level necessary to support a failure-to-accommodate claim. *Cf. Palencar v. Raijski*, Case No. 3:15–CV–1189, 2016 WL 6908116, at *6 (M.D. Pa. Nov. 9, 2016) (finding that plaintiff's "speculative prospective fear" of a problem that she never actually experienced was insufficient to state a claim for failure-to-accommodate under the Fair Housing Act).

Additionally, Defendant's failure to provide Plaintiff with her preferred accommodation—stricter enforcement of the smoke- and fragrance-free policies at the CSC—could not make it liable for failure-to-accommodate because Defendant was not required to provide Plaintiff "with a perfect accommodation or an accommodation most preferable to [her], only one that [was] reasonable and effective to address [her] disability." *Coghill*, 2017 WL 1049470, at *7 (internal citations and quotation marks omitted); *see also Williams v. Brunswick Cty. Bd. of Educ.*, 725 F. Supp. 2d 538, 549 (E.D.N.C. 2010) (finding that an employee's "personal preference" between two accommodations did not make the less preferred accommodation unreasonable); *Schlapia v. Daley*, 975 F. Supp. 785, 790 (D. Md. 1997) ("As long as Defendant's offer of accommodation is found to be reasonable, Defendant is not obligated to provide Plaintiff with the perfect or exact accommodation that he requested.").

Because Defendant offered a reasonable accommodation—relocation to the Northwest Medical Center—the fact that Plaintiff preferred Defendant to enforce its smoke- and fragrance-free policies instead does not support a failure-to-accommodate claim.

There is also no way to view this conduct, as Plaintiff suggests, as an unlawful withdrawal of an accommodation. Defendant was permitted to make a unilateral determination that the CSC was an ineffective accommodation, *see Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019), and the uncontradicted evidence shows that it made that determination (even if Plaintiff may have disagreed), *see* ECF No. 14-3 ¶ 16; ECF No. 14-3 at 106; ECF No. 14-5 at 246. Defendant was then permitted to rescind that ineffective accommodation and offer a new one, even if the new accommodation was not Plaintiff's preferred accommodation. *See Hannah P.*, 916 F.3d at 337.

Finally, Plaintiff's concern that the "informal" accommodation process caused her reassignment to the PG County Medical Center where she previously had health problems is not legally relevant. Throughout her opposition to the Motion for Summary Judgement, Plaintiff generally contends that Defendant "stopped 'informally' accommodating [Plaintiff's] disability," ECF No. 15 at 24, "never took measures to formally accommodate [Plaintiff's] disability prior to stopping '[i]nformal' accommodations," *id.*, "used the 'informal' designation as an excuse to rescind [Plaintiff]'s accommodation," *id.* at 25, and "does not have an 'informal' disability request for accommodation as it relates to workplace policies and procedures," *id.* The undisputed evidence in the record shows that Ms. Safikhani's use of the term "informal" to describe the accommodations provided to Plaintiff was a mistake and that Defendant had interpreted Plaintiff's request for an accommodation as a request for a formal accommodation

since she submitted the VOT Form in November 2014.[8] And even if the evidence did show that Plaintiff was informally, instead of formally, accommodated, the Court's role is to determine whether Defendant met the requirements of the ADA, not an internal policy. *See Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) ("While [an employer] is free to exceed the requirements of the ADA in fashioning its policies regarding disabled employees, such policies are not the definitive source of the standard by which reasonable accommodation is measured under federal law."). Defendant's actual conduct, as the Court has already explained, falls short of a failure to accommodate under the ADA.[9]

As for Plaintiff's reassignment to a location where she had previously had health concerns, the Court has already explained that this relocation was after Defendant deemed the CSC an ineffective accommodation and Plaintiff rejected an alternative reasonable accommodation. Turning down this reasonable accommodation removes Plaintiff from the category of qualified individuals with a disability who are entitled to raise a failure-to-accommodate claim. *See, e.g.*, *Elledge*, 2018 WL 6705537, at *12; *Andrews*, 232 F.3d 886 (Table), 2000 WL 1532333, at *1. It is also worth noting that less than two months after she was reassigned to the PG County Medical Center, Plaintiff was placed back at the CSC in a situation

---

[8] Plaintiff asserts in her opposition that Defendant admitted to not following normal accommodations protocol and that it instead used an informal accommodations process. ECF No. 15 at 8. In support of this assertion, she cites to portions of her deposition describing her frustration with Defendant's failure to answer her questions about the meaning of an "informal" accommodation, *see* ECF No. 14-3 at 49–54, and Ms. Harris' testimony that Defendant would occasionally try to provide accommodations to employees before the IDM paperwork was complete and that this may have occurred with Plaintiff, *see* ECF No. 16-1 at 3–4. The portion of the transcript provided to the Court does not include Ms. Harris's explanation of Defendant's process with respect to Plaintiff. There is no reasonable way to interpret this evidence as an admission that Defendant did not follow normal accommodations protocol; all it shows is that Plaintiff was frustrated with her employer's approach to the accommodations process and Defendant may have attempted to accommodate her before her IDM paperwork was complete.

[9] Plaintiff devotes a portion of her opposition to explaining how her IDM Case Manager was left out of parts of the accommodations process. ECF No. 15 at 25–26. Plaintiff cites to no evidence in the record that would support this, nor does she provide any authority supporting the theory that IDM's lack of involvement in the accommodations process makes Defendant liable for failure to accommodate under the ADA or FEPA.

that she confirmed was acceptable. ECF No. 14-3 at 66–67, 68, 111. This delay in providing an effective and reasonable accommodation does not render Defendant liable for a failure to accommodate. *See, e.g.*, *Davis v. York Int'l Inc.*, Case Civ. A. No. HAR 92–3545, 1993 WL 524761, at *8 (D. Md. 1993) (stating that three-month delay before the defendant could completely "authorize the purchase of special computer equipment, inquire into its availability, order, and install it is not excessive"). Although the Court is sympathetic to Plaintiff's health concerns, the undisputed facts in the record show that Plaintiff rejected a reasonable accommodation; therefore, an employment discrimination case is not the appropriate vehicle to raise her complaints. Defendant is entitled to summary judgment on the failure-to-accommodate claims alleged in Counts IV and XI.

### B. Hostile Work Environment Claims (Counts V, VI, VII, XII, XIII, and XIV)

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability on the basis of disability in regard to … [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). FEPA similarly prohibits an employer from "fail[ing] or refus[ing] to hire, discharge[ing], or otherwise discriminat[ing] against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of … the individual's … disability …" MD. CODE ANN., STATE GOV'T § 20-606(a)(1)(i). To prove a disability discrimination claim based on a hostile work environment, a plaintiff must demonstrate that the conduct about which she complains "(1) was unwelcome; (2) resulted because of her … disability, or prior protected activity; (3) was sufficiently severe or pervasive to alter the conditions of her employment; and (4) was imputable to her employer." *Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009) (internal quotation marks omitted). Plaintiff claims that Defendant, through Ms. Safikhani, created a disability-based hostile work environment by

reassigning Plaintiff from the CSC back to the PG County Medical Center, holding her to the new increased productivity standards, telling her on particular occasions that she was speaking too loudly on her cell phone and that she was wearing an inappropriate outfit, asking in an email whether she was contagious, and saying that her cough was disruptive.[10]

There is no dispute that this conduct was unwelcome to Plaintiff or imputable to Defendant; rather, Defendant contends that some of this conduct is unrelated to Plaintiff's disability and none of it is severe or pervasive. The Court agrees. There is no evidence that Ms. Safikhani's reprimands regarding Plaintiff's volume and clothing were based on her disability. Even accepting as true Plaintiff's feeling that she was being singled out for her disability, *see* ECF No. 14-4 at 20, this feeling does not shed light on Ms. Safikhani's motivations, and no reasonable juror could find, without more, that these reprimands were based on Plaintiff's disability.

The remaining conduct is not sufficiently "severe or pervasive" to support a hostile work environment claim. "[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (distinguishing actionable "hostile work environment" from mere "rude treatment by coworkers, … callous behavior by one's supervisor, … or a routine difference of opinion and personality conflict with one's supervisor" (internal citations and quotation marks omitted)). Conduct is sufficiently severe or pervasive where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav.*

---

[10] The Complaint alleges two hostile work environment claims and one disability discrimination claim under both the ADA and FEPA. ECF No. 1. One hostile work environment claim alleges that Defendant reassigned Plaintiff to the PG County Medical Center, thus subjecting her to conditions it knew would exacerbate her symptoms. The second hostile work environment claim and the disability discrimination claim both allege that Defendant used the new productivity standards to target Plaintiff and other individuals on the basis of their disabilities. *Id.* Both parties treat all of these claims as a single hostile work environment claim, so the Court will as well.

*Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). The plaintiff must show not only that she subjectively believed her workplace environment was hostile, but also that a reasonable person could perceive it to be objectively hostile. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001). "Such proof depends upon the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315).

Here, Plaintiff claims that her reassignment to the PG County Medical Center constituted harassment on the basis of her disability. As the Court has already discussed, this reassignment was legitimate. Moreover, "this reassignment, on its face, was not objectively hostile and cannot be construed as supporting a hostile work environment claim." *Coghill*, 2017 WL 1049470, at *9; *see also Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 602 (E.D. Va. 2015) (finding employee's reassignment from one department to another did not constitute claim for hostile work environment); *Hoffman v. Baltimore Police Dep't*, 379 F. Supp. 2d 778, 792 (D. Md. 2005) (recognizing that while being relocated may show a "workplace dispute" or "callous behavior" by supervisors, without more, it is not sufficient to show a hostile work environment).

Reasonable disciplinary measures similarly cannot support a hostile work environment claim. *Bonds*, 629 F.3d at 385. The available evidence regarding the disciplinary measures about which Plaintiff appears to complain shows that she was subject to several Level 1 or 2 corrective actions under the applicable collective bargaining agreement for failing to meet the increased productivity standards implemented in Fall 2015 and she received a Level 3 corrective action at some point after she returned to the CSC in January 2016 for mismatching the transcription for

patients on multiple occasions. ECF No. 14-6 ¶¶ 15, 17. Plaintiff herself agreed that on the occasions she was subjected to corrective actions, they were due to deficient performance, that she had indeed fallen below the productivity standards, and that there was no reference to her disability during any of the interactions related to these disciplinary measures, ECF No. 1404 at 12, 21, 70, which suggests that these disciplinary measures were not unreasonable, *see Bonds*, 629 F.3d at 385. Again, Plaintiff does contend that she felt she was being "singled out" for discipline under the increased performance standards, but this sort of "vague assertion[] … particularly without evidentiary support, [is] insufficient to establish a hostile work environment." *Coghill*, 2017 WL 1049470, at *8; *see also Butts v. Encore Mktg. Int'l*, Case No. PJM–10–3244, 2012 WL 3257595, at *4 (D. Md. Aug. 7, 2012) (dismissing hostile work environment claim where plaintiff did not provide concrete examples and made only conclusory statements).

Finally, Plaintiff's claim that she was asked whether her cough was contagious and was told that it was disruptive, even if assumed that this conduct was meant to be hurtful and offensive, is not enough to establish severe or pervasive harassment. Anti-discrimination law is not "a general civility code," *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010), and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment," *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted). While Ms. Safikhani's conduct in these circumstances may be regrettable, it does not cross the line into actionable misconduct. *See Fairbrook Med. Clinic, P.A.*, 609 F.3d at 328. Because Plaintiff cannot demonstrate that she was subjected to severe or pervasive harassment

on the basis of her disability, Defendant is entitled to summary judgment on the hostile work environment claims alleged in Counts V, VI, VII, XII, XIII, and XIV.

### C. Retaliation Claims (Counts I, II, III, VIII, IX, and X)

The ADA's retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge … under this chapter." 42 U.S.C. § 12203(a). FEPA similarly prohibits employers from "discriminat[ing] or retaliat[ing] against any of its employees or applicants for employment … because the individual has … opposed any practice prohibited by this subtitle [or] made a charge … under this subtitle." MD. CODE ANN., STATE GOV'T § 20-606(f). To establish a claim for retaliation under the ADA, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected conduct and the adverse action. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

As to the first prong, there are two types of protected conduct: opposition and participation. *Cumbie v. Gen. Shale Brick, Inc.*, 302 F. App'x 192, 194 (4th Cir. 2008). To proceed under the opposition category, "[a] plaintiff need not establish that the conduct she opposed actually constituted an ADA violation. But a complainant must allege the predicate for a reasonable, good faith belief that the behavior she [was] opposing violates the ADA." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002) (internal citation omitted). "To proceed under the participation category, an individual must make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under [the ADA]." *Cumbie*, 302 F. App'x at 194 (citing *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)). As to the second prong of the retaliation *prima facie* case, the plaintiff "must

show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotation marks omitted). The third prong requires a plaintiff to show that the protected conduct was the "but-for" cause of the adverse action. *Brady*, 222 F. Supp. 3d at 474–75.

The Court will address each of Plaintiff's three retaliation claims separately.

### 1. Complaints About Enforcement of Smoke-Free and Fragrance-Free Policies (Counts I and VIII)

Plaintiff first claims that Defendant relocated her back to the PG County Medical Center to retaliate against her for complaining about Defendant's nonenforcement of its smoke- and fragrance-free policies at the CSC. Even assuming that Plaintiff's complaint was protected conduct, Plaintiff cannot prove that it was the but-for cause of an adverse employment action. As the Court has already determined, the undisputed evidence in the record shows that Plaintiff was transferred back to the PG County Medical Center because Defendant determined the CSC accommodation was ineffective and Plaintiff rejected the reasonable accommodation of transferring to the Northwest Medical Center. Defendant is therefore entitled to summary judgment on the retaliation claims alleged in Counts I and VIII.

### 2. DLLR Complaint (Counts II and IX)

Plaintiff next claims that Defendant subjected her to a disciplinary action to retaliate against her for filing the DLLR Complaint. In order to prevail on this claim, Plaintiff must prove that filing a complaint with the DLLR about the air quality at her place of employment is protected by the ADA or FEPA. *See* 42 U.S.C. § 12203(a) (prohibiting discrimination against an individual because she has opposed conduct made unlawful by the ADA or participated in

proceedings under the ADA); MD. CODE ANN., STATE GOV'T § 20-606(f) (prohibiting discrimination or retaliation against an individual because she has opposed any practice prohibited by Title 20, Subtitle 6 of the State Government Article of the Maryland Code or participated in proceedings under that subtitle); *Reynolds*, 701 F.3d at 154. It is not.

First, maintaining a facility with poor air quality is not itself employment discrimination, and Plaintiff makes no argument that it is, so opposing this sort of conduct is not protected "opposition" activity under either the ADA or FEPA. Nor is it protected "participation" activity. Filing a DLLR complaint is not covered by the ADA, but rather by Maryland state law, so it cannot serve as the basis for an ADA retaliation claim. *See Reynolds*, 701 F.3d at 154. Even though a DLLR complaint is governed by Maryland state law, however, it is not specifically protected under Title 20, Subtitle 6 of the State Government Article of the Maryland Code. *See* MD. CODE ANN., STATE GOV'T § 6-201 *et seq.* Rather, FEPA provides that complaints about disability discrimination be filed with the Maryland Commission on Civil Rights, not the Maryland DLLR. *See* MD. CODE ANN., STATE GOV'T §§ 20-101, 20-1004(a). Because Plaintiff's DLLR Complaint was not protected conduct under the ADA or FEPA, Defendant is entitled to summary judgment on Counts II and IX.

### 3. Internal EEO Complaint and EEOC Charge (Counts III and X)

Finally, Plaintiff claims that Defendant implemented the new productivity standards for Medical Transcriptionists in retaliation for her filing the internal EEO Complaint and the first EEOC Charge. Even assuming Plaintiff's complaints were protected activity and the implementation of a department-wide productivity standard was an adverse action, Plaintiff cannot establish that the former was the but-for cause of the latter.[11]

---

[11] Plaintiff contends that the temporal proximity between the filing of the complaints and the implementation of the new standards is sufficient to establish causation. Although this could be true under certain circumstances, Plaintiff

The record lacks a specific date for the filing of the internal EEO Complaint. During her deposition, Plaintiff did not recall when she filed the EEO Complaint, but in the text of the Amended Charge of Discrimination filed with the EEOC, she stated that "in February of 2016 [Plaintiff] filed an internal EEOC complaint…" ECF No. 14-3 at 129. Thus, the undisputed evidence in the record shows that Plaintiff filed the internal EEO Complaint in February 2016 at the latest.

The EEOC Charge is similarly untied to a specific date. During her deposition, Plaintiff responded "yes" when asked, "So in May of 2016, you filed a Charge of Discrimination with the EEOC?" ECF No. 14-3 at 72. In the Amended Charge, however, Plaintiff stated "*[a]fter filing a complaint with the EEOC*, in February of 2016 [Plaintiff] filed an internal EEO complaint," *id.* at 129 (emphasis added), suggesting that the EEOC Charge was filed at some point before the internal complaint was filed in February 2016. The actual substance of the EEOC Charge refers to Plaintiff's relocation back to the CSC in January 2016. *Id.* at 121. Thus, even viewing the evidence in the record in the light most favorable to Plaintiff, she could not have filed the first EEOC Charge earlier than her return to the CSC in January 2016.

As for the implementation of the productivity standards, the evidence demonstrates that Defendant began the implementation in Fall of 2015 at the latest. *See* ECF No. 14-3 at 128–31, 136 (discussing an October 19, 2015 meeting where new productivity standards were presented to the Medical Transcriptionists). Because "[r]etaliatory conduct, by its very nature, must come *after* the protected activity," *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016), and there is no evidence from which a factfinder could find that the implementation of the productivity standards occurred after Plaintiff made her EEO and EEOC complaints, Plaintiff

makes no argument as to the specific timing of these events and, as it will explain, the Court's review of the record shows that the timing of the events cannot support Plaintiff's temporal proximity argument.

cannot prove retaliation based on those complaints. Accordingly, Defendant is entitled to summary judgment on the retaliation claims alleged in Counts III and X.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. A separate Order shall issue.

Date: <u>February    25, 2020</u>                    <u>  /s/                                        </u>
                                                                      GEORGE J. HAZEL
                                                                      United States District Judge